Filed 12/22/15  Trejo v. City and County of San Francisco CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LISA TREJO,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>　　　Defendant and Respondent. | A144135, A144969<br><br>(San Francisco City and County Super. Ct. No. CGC-13-533666) |

Lisa Trejo sued the City and County of San Francisco (S.F.) for an injury she suffered when one of S.F.'s employees grabbed her arm.  S.F. did not dispute that its employee negligently grabbed Trejo's arm, but argued that the incident did not cause Trejo's rotator cuff tear or any other serious arm injury.  A jury found S.F. liable for negligence but awarded Trejo significantly less damages than she requested.  She appeals the judgment and contends the trial court prejudicially erred when it refused to provide CACI No. 3929, which informs the jury that the defendant is responsible for any harm caused by subsequent treatment that the original injury reasonably required.  We hold that substantial evidence did not support the giving of CACI No. 3929, and affirm the judgment.

## BACKGROUND

It is undisputed that on December 1, 2012, Raquel Smith, an employee in S.F.'s Department of Public Works, pulled Trejo's right arm.  Trejo sued S.F. for her injury.

1

Prior to trial, S.F. served Trejo with an offer to compromise for $20,000 under Code of Civil Procedure section 998. Trejo rejected the offer and the matter proceeded to trial.[1]

The pivotal issue at trial was whether Trejo suffered a rotator cuff tear or other significant injury as a result of Smith's grabbing her arm on December 1, 2012. S.F. argued that Trejo had preexisting degenerative problems with her shoulder, and suffered no significant injury from the incident involving Smith.

At trial, Trejo testified that on December 1, 2012, Smith roughly grabbed her wrist, causing her severe pain in her wrist, elbow, and shoulder. She stated that she developed bruises on the top and bottom of her arm after the incident. Additionally, she suffered swelling on her right thumb and a scratch on her right wrist.[2]

Immediately following the incident, Trejo wrote a five-page statement describing in detail the incident involving Smith. She "wrote almost nothing in that five pages" about Smith's grabbing her arm. She also did not write that she was in pain.

About one week after the incident, Trejo went for medical care at the Santa Clara Valley Medical Center (Valley Medical). It was undisputed that Trejo had treatment from December 8, 2012, until April 29, 2014, at Valley Medical, for a total charge of $48,943.87.

Trejo also underwent treatment at Pacific Rim. She testified that she received ice, acupuncture, "cupping," massage, and electric nerve stimulation.[3] She maintained that the treatment did not help her and caused her to suffer additional pain. She explained: "[The treatment] hurt me because when I went in for treatment, I was already in pain and uncomfortable, so when I went they did this one treatment. [¶] [A big guy applied]

---

[1] Trejo's complaint and most of the pretrial record are not included in the record on appeal.

[2] Smith was not a party to the lawsuit. Trejo and S.F. agreed that Smith "suffered a medical condition shortly after" the incident "that had incapacitated her and she could not come to court or answer questions."

[3] In her appellate brief, Trejo asserts she received chiropractic treatment at Pacific Rim, but the record does not include any testimony indicating that this was chiropractic treatment.

really hard pressure, and he was pushing on my shoulder, and I screamed, and the doctor came in and asked what happened, and I said he's hurting me. [¶] So she said we need to stop and you might need to go have an MRI."

Trejo testified that she had an MRI at Valley Medical "probably within the next couple [of] weeks . . . ." Trejo underwent a shoulder arthroscopic procedure surgery on her shoulder on April 29, 2014. After the surgery, she was in pain. Her surgeon prescribed physical therapy.

During cross-examination, Trejo admitted that in 2011 she received a felony conviction for welfare fraud in Santa Clara County. At her deposition, Trejo testified that she never filed a claim for worker's compensation. At trial, when presented with a copy of her claim, she admitted to having filed a claim in 2003 for injuries to her shoulder, arm, neck, hand, and fingers.

Trejo stated at her deposition that she had worked out at the gym about three times per week prior to the incident, but never went back after the incident because of her injury. S.F. subpoenaed her records from the gym, and Trejo testified at trial that she went to the gym 22 times after the incident, including a visit three days after the incident.

S.F. presented evidence that Trejo posted on Facebook three weeks after the incident that she was going snowboarding. In 2013, she also posted about going on a white water rafting trip.

Trejo's expert, Dr. Robert Teasdale, an orthopedic surgeon, testified that he examined Trejo, took X-rays of Trejo's shoulder and neck, reviewed deposition testimony, and reviewed some of Trejo's medical records. He concluded that Trejo had suffered a rotator cuff tear on December 1, 2012, which became "progressively worse in spite of her surgery." He stated that it was reasonably certain that Trejo would require future medical care consisting of an MRI and arthroscopy. He estimated her future medical costs as being $82,000.

When cross-examined, Dr. Teasdale admitted that he was not aware of any of Trejo's athletic activities prior to the incident. He testified that his opinion about the cause of Trejo's injury was based on what she had told him.

3

During S.F.'s cross-examination of Trejo during Trejo's case-in-chief on November 7, 2014, Juror No. 3 posed three questions to Dr. Teasdale and three questions to Trejo. One of the questions to Dr. Teasdale asked him whether the Pacific Rim treatment could cause a rotator cuff tear. The juror asked Trejo what her level of pain was after her treatment at Pacific Rim compared to her pain before this treatment. Trejo's counsel did not solicit further testimony from these witnesses to address these questions.

Dr. Dave Miles Atkin, an orthopedic surgeon and S.F.'s expert, also testified. He met with Trejo, did a physical examination of her, and took an oral history from her. He also reviewed medical records, photographs, and depositions. He noted that the initial medical examination of Trejo on December 8, 2012, at Valley Medical indicated a normal shoulder exam with no objective evidence of injury. He testified that the medical records indicated that the exam showed no redness, tenderness, or swelling, which would be consistent with a tear. He emphasized that the exam also showed that the "active range of motion" was "full." Trejo was "able to actively raise [her] arm completely in elevation, raise [her] arm completely in external rotation and raise [her] arm in flexion." Such motion was inconsistent with an acute rotator cuff tear.

Dr. Atkin noted that Trejo's next visit four days later indicated that there still was no swelling in the tissues. He observed the following from the medical records: "She has tenderness to the right upper extremity which is described as diffuse meaning nonfocal, diffuse and nonfocal, decreased range of motion secondary to pain with full grip strength. So this is a different exam than she presented with four days prior." He asserted that it was not typical to have an exam four days later that revealed a different injury. Dr. Atkin found it significant that the records revealed that Trejo had therapy twice, did not show up for her therapy twice, and canceled her therapy once. He stated that a patient needed to cooperate in order to get better.

Dr. Atkin reviewed the records and photographs from Trejo's arthroscopic surgery on April 29, 2014, that was completed by Dr. Elizabeth Desmond. He noted that Dr. Desmond found four different degenerative conditions: arthritis, a bone spur, labral

4

fraying, and degeneration of the rotator cuff. He stated that Dr. Desmond did not see any focal tear of the rotator cuff. Dr. Atkin observed colored photographs in the medical record and also did not observe any tear in Trejo's rotator cuff. He concluded that these findings were inconsistent with one single traumatic injury. He maintained that Trejo's condition was more common in a person who engaged in overhead sports or weightlifting, and S.F. presented evidence that Trejo was an active body builder for years.

Dr. Atkin also considered Trejo's medical records prior to the incident on December 1, 2012. He stated that Trejo was assaulted in 1995, and sought emergency care related to her right shoulder. She complained of decreased range of motion and reported that she felt "her shoulder pop." An X-ray did not show any evidence of an acute fracture or dislocation. In October 1998, a medical record indicated that she was having right shoulder and mid-back pain. Another medical record dated November 17, 2004, referred to Trejo's experiencing bilateral shoulder pain. Similarly, on August 27, 2009, a medical record provided that Trejo was having pain under her arm, and the pain was radiating down into her arm, elbow, and wrist. On July 5, 2012, Trejo was seen at Valley Medical "with a chief complaint of, according to patient, 'right shoulder pain is constant and pain increases with movement.' " He concluded that this medical history was consistent with a person's having a preexisting shoulder condition.

When he examined Trejo, Dr. Atkin observed that she did not appear in any apparent distress. He found that the muscles on her right side were bigger than those on her left. He explained that he would expect atrophy if an injury caused a person not to use that arm or forearm. He found that Trejo did not pass the credibility tests because she presented a non-functioning limb during testing, but he observed her using her right arm normally when getting on and off the table.

Dr. Atkin testified that rotator cuff disease is "overwhelmingly degenerative" and "the leading cause of rotator cuff disease is aging and use." He believed that Dr. Teasdale did not have Trejo's complete medical file, as he did not refer to the records in

5

1995, 1998, or 2009. He also did not believe Dr. Teasdale was aware that Trejo had been a weightlifter.

Dr. Atkin concluded that a pull on Trejo's arm would have resulted in a muscular strain and that she should have received treatment for that type of injury. He explained that having surgery "for four degenerative conditions in your shoulder would not be related to an isolated strain." He did not believe that the pulling of Trejo's arm affected the progress of her shoulder's degenerative condition. He added that it would be "very rare" for the pulling on the arm to injure a rotator cuff.

Dr. William Kevin Hoddick, a diagnostic radiology specialist, also testified as S.F.'s expert. He examined imaging studies of Trejo's shoulder. He reviewed an MRI image from July 2013. He said the image showed "wearing out changes" and no evidence of a trauma injury. He testified that the results of Trejo's surgery and the MRI findings "matched completely." He explained: "There was no evidence of rotator cuff tear when they looked inside the shoulder with a scope. There was no evidence of tear when they looked on the outside with the MRI. [¶] Now, what you do see and the uninitiated may confuse with a tear is intrasubstance degeneration or wearing out change. Inside the substance of that rotator cuff, there's wearing out change. Some of those shoelace fibers have become discontinuous over time, but they're worn out. They're not broken." With respect to Dr. Desmond's findings after completing Trejo's surgery, Dr. Hoddick explained: "You cannot make a shoulder look like that with one injury or one event. It's a physiologic impossibility. You typically only get these with wearing out."

Dr. Hoddick also examined a second MRI image that Dr. Teasdale had requested shortly before trial. Dr. Hoddick declared that it revealed, "These wearing out changes have progressed." He stated that in his opinion the cause of Trejo's rotator cuff condition was "a cumulative longstanding forward progressive wearing out condition, not an injury. Using the best tool we have available in modern medicine to find an injury, there's none."

On November 12, 2014, the trial court considered the proposed jury instructions, and S.F.'s objections to Trejo's proposed CACI Nos. 3927, 3928, and 3929. After

6

listening to argument, the court stated that it was giving CACI Nos. 3927 and 3928, but not CACI No. 3929.

During closing argument, Trejo argued that she suffered a rotator cuff tear on December 1, 2012. S.F. argued in its closing argument that Trejo did not establish that she suffered a rotator cuff tear as a result of Smith's grabbing her arm. S.F. asserted that Trejo's pain was caused by the degenerative changes in her shoulder that existed prior to the incident, and that she suffered no traumatic injury on December 1, 2012. S.F. suggested that Trejo be compensated for an unpleasant experience on one day with an S.F. employee.

The jury concluded that Smith was negligent and her negligence was a substantial factor in causing harm to Trejo. It also determined that Smith touched Trejo with the intent to harm or offend her and Trejo was harmed or offended by this touching. It also found that a reasonable person in Trejo's situation would have been offended by the touching. The jury awarded Trejo $8,283.80 for past economic damages related to the incident and $2,500 for non-economic damages from the harm caused by the incident. The jury did not award Trejo any past or future wage loss, future economic damages, or future non-economic damages.

Since Trejo failed to recover more than the $20,000 offer to compromise made by S.F. pursuant to Code of Civil Procedure section 998, S.F. filed a cost bill under section 998 and a motion for entry of judgment in its favor. S.F.'s costs totaled $51,502.24. Trejo did not oppose S.F.'s motion and did not appear at the hearing on the motion. On March 27, 2015, the trial court entered judgment in S.F.'s favor for $37,236.69.

Trejo filed a premature notice of appeal and then a second, timely, notice of appeal. We consolidated these two appeals on June 11, 2015.

## DISCUSSION

Trejo's sole argument on appeal is that the trial court erred in refusing to instruct the jury with CACI No. 3929. For the reasons explained below, we conclude that Trejo has failed to establish any prejudicial error.

An initial tortfeasor remains liable for additional subsequent harm when "the chain

7

of causation set in motion by the original tort remains unbroken." (*Hastie v. Handeland* (1969) 274 Cal.App.2d 599, 606.) Aggravation of the original injury while seeking or receiving medical attention is foreseeable; it is not a superseding cause, even if it involves negligence or malpractice by the subsequent actor. (See *Anaya v. Superior Court* (2000) 78 Cal.App.4th 971, 975-976.) CACI No. 3929 instructs on this principle in the context of subsequent medical treatment, and reads: "If you decide that [the defendant] is legally responsible for [the plaintiff]'s harm, [the defendant] is also responsible for any additional harm resulting from the acts of others in providing medical treatment or other aid that [the plaintiff]'s injury reasonably required, even if those acts were negligently performed."

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by [the plaintiff,] which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) "A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.) . . . [¶] Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" (*Soule,* at p. 580.)

CACI No. 3929 may appropriately be given when there is evidence that a further injury resulted from negligently performed subsequent medical treatment or from a risk inherent in the necessary medical care. (See *Henry v. Superior Court* (2008) 160 Cal.App.4th 440, 452, fn. 6.) The important factor in determining whether subsequent negligent medical treatment is attributable to the defendant is " 'that the medical treatment is closely and reasonably associated with the immediate consequences of the defendant's act and forms a normal part of its aftermath.' " (*Id.* at pp. 451–452.)

Here, the record did not show that the care at Pacific Rim resulted in Trejo's suffering an injury or an aggravation of an injury caused by Smith's grabbing her arm. In a personal injury claim, the plaintiff is required to prove that the defendant's conduct was the proximate cause of the plaintiff's injuries. (*Jones v. Ortho Pharmaceutical Corp.*

8

(1985) 163 Cal.App.3d 396, 403.) "The law is well settled that in personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case. [Citations.]" (*Id.* at pp. 402-403; accord *Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367, 1385 [in personal injury case, "causation must be founded upon expert testimony and cannot be inferred from the jury's consideration of the totality of the circumstances unless those circumstances include the requisite expert testimony on causation"].)

Expert testimony is required to establish causation to a reasonable medical probability because knowledge of injuries that are wholly subjective is generally beyond the common experience of the average fact finder. (See Evid. Code, § 801, subd. (a).) Accordingly, in establishing causation in a personal injury case, a victim's own self-interested testimony may not serve as a substitute for the testimony of a medical expert. (See, e.g., *Oliveira v. Warren* (1938) 24 Cal.App.2d 712, 716-717.)

Here, the record contains no medical evidence establishing that Trejo's treatment at Pacific Rim injured her or exacerbated her injury. The only evidence related to causation was Trejo's own testimony that the treatment did not help her and caused her additional pain. In the record before us, Dr. Teasdale, her expert, did not express any opinion as to any injury she suffered from her treatment at Pacific Rim.

Furthermore, an additional requirement under CACI No. 3929 is that the treatment at Pacific Rim was "reasonably required" due to Smith's pulling on Trejo's arm. Trejo refers to no evidence in the record showing this treatment was reasonably required. She cites no evidence that even indicates what prompted her to go to Pacific Rim or that any doctor believed the treatment provided there was reasonably necessary to help her recover from her arm injury resulting from Smith's pulling on her arm.

CACI No. 3929 should be provided when a defendant is claiming reduced or no liability based on the subsequent conduct of another tortfeasor.[4] Here, Trejo has pointed

---

[4] The use note for CACI No. 3929, citing *Henry v. Superior Court, supra,*160 Cal.App.4th at page 455 and *Marina Emergency Medical Group v. Superior Court* (2000) 84 Cal.App.4th 435, 441, reads: "Under Proposition 51 (Civ. Code, § 1431.2), the

9

to nothing in the record indicating that S.F. argued that it was not liable or its liability should be reduced because Trejo's injury was caused or exacerbated by Pacific Rim's conduct. To the contrary, S.F. contended that Smith's grabbing of Trejo's arm did not cause any significant injury and that the rotator cuff tear was completely unrelated to this incident. Thus, under S.F.'s argument, any treatment for the torn rotator cuff and costs related to treating that injury were unrelated to the incident on December 1, 2012.

Trejo contends that the trial court erred because it incorrectly ruled that the instruction is proper only when the evidence shows the subsequent treatment was negligent. She maintains this was legally incorrect, as there does not have to be a finding of subsequent negligence. (See, e.g., *Hastie v. Handeland, supra* 274 Cal.App.2d at p. 605 [" 'If the negligent actor is liable for another's bodily injury, [the actor] is also subject to liability for any additional bodily harm resulting from normal efforts of third persons in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are done in a proper or a negligent manner' "]; see also *Blecker v. Wolbart* (1985) 167 Cal.App.3d 1195, 1201; *Maxwell v. Powers* (1994) 22 Cal.App.4th 1596, 1606-1607.)

Even if we presume that the trial court's reason for refusing the instruction was erroneous, Trejo cannot prevail because, as explained above, substantial evidence did not support the giving of such an instruction, and therefore any alleged error was harmless. Trejo argues that there was no credible explanation for the jury's decision to reduce severely her award of damages "other than the jury's perception, whether erroneous or not, that [Pacific Rim] had significant responsibility for causing and/or aggravating Trejo's injury." She maintains that the low award of damages despite finding S.F. liable for Smith's offensive touching with the intent to harm Trejo supports her claim that it is likely that the jury viewed Pacific Rim's treatment of her as the cause of her injury rather than Smith's grabbing of her arm. She insists that she was entitled to have the jury

original tortfeasor is entitled to have the jury allocate fault to any subsequent tortfeasors with regard to the subsequent aggravation of the injury. Each is responsible only for a comparative share of the noneconomic damages attributable to the aggravated injury."

10

instructed that S.F. might be liable for the costs related to the additional harm caused by Pacific Rim.

In her reply brief, Trejo maintains that she did not have to prove Pacific Rim actually caused subsequent harm and admits she never alleged that. She claims that the fact that Juror No. 3 indicated by his or her question that Pacific Rim had caused subsequent damage to her was sufficient to require the instruction. She admits that she requested CACI No. 3929 only after the juror submitted the question because she never alleged Pacific Rim caused an injury.

Juror No. 3 submitted a question prior to hearing S.F.'s expert witnesses' testimony establishing that Trejo suffered no serious injury from Smith's grabbing her arm. After the juror posed the question, Trejo did not provide any evidence addressing these questions.

As noted, the pivotal issue at trial was whether Smith's grabbing of Trejo's arm caused her to suffer a torn rotator cuff. Trejo presented no evidence that Trejo's treatment at Pacific Rim was reasonably required as a result of the injury suffered on December 1, 2012, and she concedes that she neither alleged nor submitted any evidence that the treatment at Pacific Rim caused her an injury or exacerbated her injury caused by Smith's grabbing of her arm. (See, e.g., *Maxwell v. Powers, supra,* 22 Cal.App.4th at p. 1607, italics added ["Parties have the 'right to have the jury instructed as to the law applicable to all their theories of the case *which were supported by the pleadings and the evidence*' "].) Since neither the evidence nor pleading supported the giving of this instruction, the trial court did not commit prejudicial error when it refused to instruct the jury with CACI No. 3929.

Trejo's argument that there was no explanation for the jury's award of damages has no merit. If there was no significant injury caused by the original offensive contact by Smith, of course, there could be no additional harm resulting "either from the negligence of doctors or hospitals who furnish necessary medical care, or from the materialization of a risk inherent to necessary medical care . . . ." (*Hastie v. Handeland, supra,* 274 Cal.App.2d at p. 606.) The jury awarded Trejo damages to compensate her

11

for the minor injury she suffered from being touched in an offensive manner.  It found, as the evidence showed, she suffered no significant injury as a result of this touching and much of the later medical care was unrelated to the incident involving Smith.

## DISPOSITION

The judgment is affirmed.  Trejo is to pay the costs of appeal.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Miller, J.

12